COX-JAMES CO. *v.* HASKELITE MANFG. CORPORATION.

1. SALES—UNIFORM SALES ACT—IMPLIED WARRANTY.
   Where purchaser of waste conveyor informed seller of particular purpose for which it was required, and relied on seller's skill and judgment, there was implied warranty that system installed would be reasonably fit for purpose required (2 Comp. Laws 1929, § 9454).

2. SAME—SELLER INFORMED OF NEED BOUND TO MEET SUCH NEED.
   Seller informed of purchaser's needs for waste conveyor and undertaking to solve problem was in duty bound to find out what was required to meet such needs.

3. SAME—IMPLIED WARRANTY—SELLER NOT ENTITLED TO RECOVER WHERE NEED NOT MET.
   Seller impliedly warranting that waste conveyor installed by it in buyer's factory was reasonably fit for purpose required, of which it was informed, was not entitled to recover purchase price where system installed failed to work and buyer rescinded contract of sale.

Appeal from Superior Court of Grand Rapids; Verdier (Leonard D.), J. Submitted June 5, 1931. (Docket No. 121, Calendar No. 35,800.) Decided June 25, 1931.

Assumpsit by Cox-James Company, a Michigan corporation, assignee, against Haskelite Manufacturing Corporation, a corporation, for factory equipment. Judgment for defendant. Plaintiff appeals. Affirmed.

*Wicks, Fuller & Starr,* for plaintiff.

*Travis, Merrick, Johnson & McCobb,* for defendant.

Clark, J. In this action in assumpsit, plaintiff claims for certain material and equipment installed in defendant's factory $1,700.

In a trial without a jury there was judgment of no cause of action. Plaintiff has appealed.

After a study of the record and a consideration of the briefs and argument, we accept the opinion of the trial judge:

"In the fall of 1929 defendant company decided to install a conveyor system in its plant for the removal of waste, dust and refuse in place of the blower system then in use. There were two sources of this refuse material; one, the waste and dust from sanding machines; the other resulting from the manufacture of veneers and consisting of strips, dust and shavings which were run through a wood hog to be cut finer before being transmitted to the boiler-plant to be used as fuel.

"Through its manager, Curran, defendant summoned one Dettling who is a conveyor engineer and a salesman representing a concern engaged in the manufacture and sale of conveying machinery and equipment. Curran made known to Dettling the purpose for which defendant desired a conveyor system, took him through the plant, showed him in a general way what materials were to be handled, asked him to figure on an installation that would accomplish the purpose and gave him the run of the plant so he could determine for himself what was needed. Dettling made what he calls estimate request drawings or a proposed plan and sent them to his employer to submit figures. Later he informed Curran that his firm did not figure on the job but that he would have the James Company, plaintiff, figure on it.

"Dettling then brought Gratyck, the supervising engineer of plaintiff company, to the defendant. Gratyck then went through the plant, was given the

same opportunity to investigate as Dettling had had, made a sketch of a plan, but in the main adopted the suggestions of Dettling. Although the testimony is in dispute, there is no doubt in my mind that at this first conference Norris, defendant's engineer, said that he wanted a system that would work and was assured by both Dettling and Gratyck that plaintiff company was capable of installing one and that they suggested that he turn the whole matter over to plaintiff. Defendant made no plan but merely indicated what it desired to have accomplished, leaving the details of the means to be employed entirely to the judgment and discretion of plaintiff. Plaintiff submitted its proposal in writing to install for the sum of $1,450, which was accepted by defendant.

"The first disagreement arose when as a part of the system, plaintiff attempted to install an apron-conveyor which was the type specified by Dettling and adopted by Gratyck. When defendant's manager discovered that this would permit dust to escape into the boiler-room, he refused to permit its installation because of the danger. Dettling was then called by Gratyck and suggested a screw-conveyor. They were then told by the manager that he didn't care what they put in so long as it would do the work and was dust-tight. A screw-conveyor was then installed and the system finally put in operation.

"Almost from the start there was trouble. The waste material became jammed in the screw-conveyor so that it would not operate. The material bridged as it was delivered into the receiving tank, causing stoppage of the system. The material caught fire before it reached the furnace by a back-fire through the pipe into which it was discharged into the furnace. That the system did not work is so little disputed by the plaintiff that it may almost be said to be conceded. Numerous efforts were made to correct so that the system might operate satis-

factorily. Finally Gratyck and James called on Norris and asked for his approval of their bill of $1,450 so that plaintiff might collect. Norris refused his approval but said defendant would pay if plaintiff would make the system work. He then suggested that possibly the substitution of a flat bottom tank for the pitch bottom tank installed and some other minor changes might correct the defects. Although the testimony in regard to this phase of the case is in dispute, it is my finding that plaintiff seized upon these suggestions as a last chance and agreed to make the changes on their own responsibility with the understanding that if the changes resulted in success, plaintiff was to receive $250 additional (which represented the difference between an estimate of $1,700 which Norris informed plaintiff he had obtained from another company for installing an entire new conveyor system, and plaintiff's original contract price of $1,450); but that if the changes did not make the system operate satisfactorily, plaintiff would remove it. Unfortunately, the changes did not accomplish the hoped-for success; the same trouble continued. Defendant finally rescinded the contract of purchase and caused plaintiff's system to be removed and replaced by the other system.

"There has been a studied effort by the plaintiff both in its proposal, in its pleadings and in its proof, to maintain that its claim is merely one for the price and value of certain materials sold and delivered to and for certain work done by the plaintiff for the defendant at its request. But this case involved much more than that. The thing sold here was not merely a certain storage tank, conveyor, motor, etc., nor a sale of specified articles under and by their trade name. Nor is this a sale of certain articles selected and designated by the defendant; the selection and designation was left to the judgment of plaintiff. The thing sold was a conveyor system supposed to perform a certain function,

namely to convey the waste material resulting from defendant's plant operations from their sources to the furnace where they were to be consumed as fuel.

"The particular purpose for which the system was required was made known by the buyer to the seller and the former relied on the latter's skill and judgment. There was therefore an implied warranty that the system would be reasonably fit for the purpose. It proved to be wholly unfit. This case, therefore, comes clearly within the provisions of subdivision 1 of section 15 of the uniform sales act. (2 Comp. Laws 1929, § 9454, and see, also, *Dunn Road Machinery Co.* v. *Charlevoix Abstract & Engineering Co.,* 247 Mich. 398 [64 A. L. R. 947]; *Lutz* v. *Hill-Diesel Engine Co., ante,* 98; 1 Williston on Sales [2d Ed.], § 235.)

"If it be said that the defendant did not make known to the plaintiff the particular purpose, the answer is that it did, to both Dettling and Gratyck. They both were informed by defendant of its problem and undertook to solve it. Defendant relied on the skill and knowledge of plaintiff and the latter was in duty bound to find out what was required to meet its customer's needs.

"If it be said that plaintiff was not informed as to the size and nature of the waste-material to be conveyed, the answer is that it was its duty to inform itself.

"If it be said that defendant relied on the skill and judgment of Dettling and not on that of plaintiff, the answer is that Dettling was neither the agent or employee of defendant. Dettling's interest was to earn a commission on the sale of the appliances used in the system. It was he who recommended to defendant the ability of plaintiff company to install a suitable system. If plaintiff, with the same opportunity as Dettling had to ascertain defendant's requirements, chose to take Dettling's recommendations instead of devising a plan of its own, then, by adopting his recommendations, it must

be held to have accepted the responsibility that they would meet the defendant's needs.

"My conclusion is that plaintiff is not entitled to recover. Defendant has pleaded set-off and recoupment but has made no proof thereof and in its brief waives any claim to the same. A judgment of no cause of action may be entered, with costs to be taxed in favor of defendant."

Affirmed.

Butzel, C. J., and Wiest, McDonald, Potter, Sharpe, North, and Fead, JJ., concurred.